Good morning, everyone. I want to extend a special welcome to our many observers from all around the world, representatives of the intellectual property-oriented courts, union nations. However, we are proceeding business as usual, no special indulgences. Counsel, you may proceed. The first case is No. 2008-1459, Martek Biosciences v. Nutrinova. Mr. Pizzuniac. Thank you. May it please the Court. There are four patents involved in this appeal, two patents that are appealed by the Nutrinova and Lanza parties, two patents that are appealed by Martek. And you may assume that we have tried to digest the complexities in advance. Thank you, Your Honor. I'm not sure if Your Honor has had a chance to review the facts that was served yesterday. No, but we received it. And let me also say that unless it changes or moves your argument today, if there are points that need to be raised based on that reexamination result, we will accept additional briefings. So let's talk about that before we finish. Your Honor, there's nothing unique about the patent office's rulings. The patent office did not put the patent office's rulings. That's correct, Your Honor. I'm pointing out that there really is no inconsistency between what the patent office did and what was before the court, because the same issues before the court were the basis for the patent office's consolidated into one reactor. We have testimony from Dr. Wang that one of skill and the art would understand that to be a mixture. Why isn't that more than enough for the district court to make the finding that it did? It is not, Your Honor, because as the PDO also held, it may be— We're not talking about what happened at the patent office. We have a record here. We have a specification. We have testimony of expert witnesses. We don't need much more. Your Honor, because a mere unsupported statement by an expert witness cannot be substantial evidence. He says one of skill and the art—we have a statement in the specification consolidating the cells of several reactors into one. Why isn't that a mixture? Because that is not a mixture of any different strains and it's certainly not a mixture of the claimed strains and it certainly is not— Well, that reference was made to mixing two things of the same strain, but why wouldn't one of skill and the art be pretty automatically inclined to say, well, why not just throw in another strain, which is mentioned in the same specification? The strains are all there. Because, Your Honor, there is no written description that would indicate that that was ever the intention. The consolidation discussed in the specification involved a way of defoculating the fermentation mixture and making sure that no one got a single strain. Your problem is that this is a jury verdict and this is a written description, a fact question, on which we owe very great deference to the jury. So there doesn't have to be much there to support the decision. You're still required to have substantial evidence, though, right? That is not— In order to support it. Are you telling us there was insubstantial evidence in the record to support the jury's finding? Your Honor, you're absolutely correct. If we are simply to hold, well, an expert without any basis, based nothing more than on speculation says, oh, I think a person skilled in the art would read this to do that. If that by itself is enough, then we have eliminated essentially the substantial evidence requirement, because one can always get some expert who will come in and say something like that in court. If that becomes sufficient, then forget it. There's no more need for substantial evidence. The only trouble you have is the specification talks about consolidating, and the specification mentions specifically the two strains that are at question in this claimed invention. Why wouldn't one of skill in the art naturally say, well, when I'm consolidating, I'll pull out a two-strain instead of one? It seems not to be a great leap of imagination. But, Your Honor, that is now an issue of obviousness. No, it's a question of fact. The jury decided against you. No, the question is, was there a written description of the invention which requires a specific mixture of two specific strains? They're both mentioned in the spec by name. Also, many other species are mentioned in the spec. But why wouldn't one of skill in the art just combine those into one reactor, as indeed this particular expert said they would? Because Your Honor is now applying a question of whether it would be obvious to do so. A written description requirement is not an obviousness inquiry. A written description means how would one of skill in the art interpret it? It's actually a claim construction sort of an enterprise. He reads these words and says, I would combine two strains. And you haven't given me any reason why that is totally outside the science or the technology. It is because, in fact, you have two different strains. And as demonstrated in the specifications itself, different strains operate under different parameters and they grow differently. And so now you're trying to combine two strains. And I may point out not even two strains, it's two species. Combining two species where there's no indication in the prosecution record or in the specifications that they will grow under the same unique circumstances. And this is, Your Honor, pure obviousness. When you have a very specific teaching, a single, very specific teaching of here is how we maximize the production of a single strain. And we do that by growing those strains in multiple fermenters and then combining them, the results. That is hardly a teaching of taking different species and then growing them and combining them. Even then, you still don't get to the claims because the claims require a fermentation mixture of two species. How about the patent that deals with the non-chloride sodium salt? Yes, Your Honor. Salt, of course, is a product of an acid in a base, and the court construed it to mean the base, sodium hydroxide. Seems strange. Well, Your Honor, this was an important claim construction error, we believe, by the trial court. But there was testimony here, wasn't there? Dr. Wang. Yes. He really went to bat for your opponents and convinced the jury and the court. Well, that's exactly the problem, though, Your Honor. We had essentially what should have been a claim construction issue submitted to the jury as evidence. This court has repeatedly held that claim construction is for the court. It is a question of law. One does not argue the prosecution or anything like that to the jury to convince the jury how the claim should be interpreted. The fact is, Your Honor, as I'm sure this court is well familiar with, salts are classically defined as a reaction of an acid in a base. You get the salt and you get water. The water comes from the hydroxide and from the hydrogen. But they cited not only Dr. Wang's testimony, but he did find, I thought that it was curious, a couple of dictionary-type publications which could be construed as defining the base as a salt. Yes, there's different dictionary definitions of a salt. There's one dictionary that Professor Wang cited which talked about acid salts and hydroxide salts. But this, Your Honor, is precisely why the prosecution record in this case is so important. During the prosecution of the 281 patent, the patent office cited a publication that included a combination of brine to which sodium hydroxide was added. The applicant, Martek, said, no, this is irrelevant by twice saying sodium hydroxide is a base. It is precisely because we're dealing with such a... But counsel, I think you need to be precise. The prosecution history, the patent applicant argued the non-chloride sodium salt, see they characterized it as a salt, is the well-known base sodium hydroxide. So why isn't the fact that they characterized it as both a salt and a base defeat the argument that you're trying to present, which is it's only a base and can't be considered a salt for purposes of these claims? It is because, Your Honor, it is not only how they characterized it, which is as a base, because then you get into the conflicting technical issues of whether a salt is really a mixture of an acid and a base. If a salt is a mixture of a salt and a base, once you classify something as a base, it can't be a salt by definition. But there's a second issue. What the applicant distinguished was the addition of sodium hydroxide to a sodium chloride brine solution. And this is precisely what the issue was on the infringement. The Lanzus process starts with pure sodium chloride in the fermentation mixture. No question about it, that's the starting fermentation mixture. Then, as the fermentation continues, part of the process generates an enormous amount of acid, which has to be buffered with a base. Why is the Lanzus process relevant to claim construction? Why is this at all relevant to whether we construe the claim as excluding or excluding the sodium hydroxide? Because the applicant not only said that the sodium hydroxide was a base, but said that what the Somerville reference, the prior art site... They said it was a base, but they also said it was a salt, and that's all it used to be. But they also said... Are you saying it's impossible for something to be both a salt and a base? Well, it becomes a confusing issue that should have been resolved by taking the applicant at its word and saying, if you're going to call it a base, you're going to call it a base. The applicant called it both a salt and a base. Is it technically impossible for something to be both a salt and a base? For purposes of... I think that's a yes or no. One cannot have two inconsistent positions, because if the classic definition of a salt is a reaction of an acid and a base, and you have the word salt in the claims, and now you're saying, well, something can be both a salt and something that forms the salt at the same time, you have an indefiniteness issue, which is why the definiteness requirements of the law should have counseled the instruction. But coming further, Your Honor, it was more than just saying that a salt is something other than a base. The applicant distinguished the addition of sodium hydroxide to brine as essentially leading away from the invention, because the point of the invention was that the fermentation mixture was going to be a non-chloride sodium salt. And this was the whole point of the claim construction, that in our case, you do start with a brine, sodium chloride fermentation mixture, and you add sodium hydroxide as a base to buffer the pH. And therefore, we were doing exactly what, at least in that part of the process, we were doing exactly what is in the prior art. So when the applicant told the patent office, this leads away, then that, by definition, should have been considered as part of the claim construction. But you're arguing that the prosecution history supports your position, and the fact that they disclaimed it during the prosecution history. Is that correct? They disclaimed exactly what we say is what we're doing. But does it have to be really clearly an unmistakable disclaimer before we can do that? Our case law says that. It has to be clear and unmistakable in the prosecution history. Absolutely correct, Your Honor. It has to be clear and unmistakable, and we say that it is. But the Somerville reference was being distinguished because it didn't suggest fermentation of microorganisms at all. That's correct. Well, that's hardly supportive of your position, that they're clearly and unmistakably disavowing something, isn't it? Except for... They were discussing something entirely different. They did distinguish the Somerville reference on that basis. They also said that what Somerville was doing in adding sodium hydroxide to the brine led away from the invention. Well, the light is flashing. We'll save you rebuttal time.  We've messed up your argument with questions. Mr. Kostanius. Thank you. Good morning, and may it please the Court. You heard Mr. Pozuniak and I discussing the consolidated statement in the 1988 spec. Now, if I'd have been him, I'd have answered to Judge Rader that that spec was talking about mixing already fermented cells. And the claim talks about mixing before fermentation. It wasn't addressing the topic at all of the claimed invention. That isn't quite what he said, but it seems to me you have to answer that point. Well, I'll be happy to answer it, Judge Rader, and with regard to that particular clause, I'm certainly not one of skill in the art, but I think your questioning to Mr. Pozuniak points out that the testimony that was given by Dr. Wang was grounded in the language of that specification. And that distinguishes every one of the cases that are cited against us by Lonza because those were cases where there was no evidence in the specification whatsoever. And what the expert gave was the perspective of one of ordinary skill in the art and said to this jury, to the jury's apparent satisfaction, One of skill in the art would also discount the order of fermentation and mixing? Well, I'm not sure that Lonza ever said at trial that the order was important in the same way, but that wasn't his answer to you today. Of course, it was their burden of proof. It is a factual issue. And ultimately, the jury sided with us and not with Lonza. And I think the court's questioning suggests that you appreciate our position with regard to the cell consolidation clause. Let me back up for a second and hopefully tell the court where I hope to go with my argument today. First, I'll address the arguments that Lonza has made here today. And I'll turn first, in my remarks, to 281. And if there are any further questions on the 594 patent, Judge Rader, I'll be happy to answer those. And I hope you'll also tell us why sodium hydroxide is a salt. And, in fact, that's where I'll start there. And then I'll turn to the two patents that are on our cross-appeal. The 244 patent, that's the patent dealing with the definition of animal animalia, and then the 567 patent. And I hope that I'll be able to do all of that in 15 minutes or 12 minutes and save my three for rebuttal. Let me start with the 281. Judge Newman, your question about whether there was a disclaimer here? Again, I think the questions from Judge Moore, Judge Rader, I think all of you in your questions to my colleague on the other side demonstrated first that this was not any kind of disavowal of NaOH as a non-chloride sodium salt. And, quite contrary, the language that distinguishes the Somerville reference specifically indicates that this base is, or the sodium salt, the non-chloride sodium salt, is the well-known base. So, far from being a disclaimer, the language of the prosecution recognized explicitly that NaOH was a non-chloride sodium salt. So I don't understand that. And then with regard to Judge Moore's question of whether a salt can ever be a base or vice versa, the record, both in front of the patent office, again, the same passage, which appears twice in the appendix, and I've noticed, Judge Moore, that the parties use different conventions for citing, but it's the passage that said A4329, and others have cited it as A17820, but it's the same page, where the applicant says that the non-chloride sodium salt in Somerville is the well-known base. That answers both of the challenges that Lanza has made. One, it tells us that sodium hydroxide is a non-chloride sodium salt, and two, it tells us that a salt can be a base. And that's the question you put directly to my opponent. Just out of curiosity, why is it all relevant, whether it's a base, to the claim construction? I mean, the only term the district court was asked to construe is non-chloride sodium salt. And both parties seem to go down the road of base, base, base, but why isn't the construction just an ionic compound composed of a sodium ion and an ion other than a chloride ion? You're reading from the judge's claim construction order, Judge Moore? No, I'm giving you mine. Oh, okay. In that case, I won't try to find yours in the claim construction order. Why don't you both go down the road of this construction must involve whether or not this is a base? Why is that relevant to the construction? I think, Judge Moore, if you look back at the way the issues were joined, this was the way that it was being argued by our opponent. So the question of whether or not... Do you agree that the term is just non-chloride sodium salt? I agree that that's the term. That's the only term that we're asked to construe. So why isn't the proper definition simply an ionic compound composed of a sodium ion and an ion other than chloride? I think that definition will work perfectly fine for purposes of this case. I think what you saw in the claim construction dispute in the trial court, though, was an effort to frame the dispute specifically to the facts of this case. I know that several opinions of this court suggest that it's valid and helpful to the court for claim construction purposes to know what is at stake in the case. And what was at stake in this case was an argument that because NaOH was a base, it could not simultaneously be a salt. And so the parties, I think, reasonably focused their attention on whether or not something that is characterized as a base could also be included. Isn't one of your points that the patent itself defines non-chloride containing sodium salts to include certain bases? It does, exactly. That's exactly what our... It may seem strange, but the patentee was its own lexicographer. Well, not only... I'm not sure it's all that strange. If you find the appendix of A4335, a treatise, I understand the role of treatises with regard to claim construction, but it is somewhat relevant to how one of ordinary skill in the art would read it. And that treatise does say, strictly speaking, ionic compounds such as NaOH, specifically called out there, such as NaOH and CaOH2 are salts. And that is basically the point with regard to claim construction. Would you mind if I moved you to the 244 patent? I'm really curious about whether the animal kingdom includes human beings. Well, I think there are two answers to that. I don't initially read this patent as one that would likely extend to cover human beings. It uses a lot of characterizations that we wouldn't normally, traditionally apply to the discussion of human beings. If you'd seen me play tennis, you'd know I'm an animal. Laughter So, I'm... Matter of definition? In fact, Judge Moore, I think this is the case that really puts this court's decision in Phillips to the test. Does this court really mean that when a patentee sets forth an explicit definition in the specification, that that definition controls? In Phillips, this court said it governs and it is dispositive. In fact, when a definition like that is put forth in the specification, that means that no construction is needed of the term. And let's keep in mind that it was only the term animal that the judge construed. Now, with regard to that, the judge's error was not honoring the definition that was explicitly set forth in the 244 patent at column 5, lines 11 and 12. You're saying that that definition with all of the animals that are mentioned by definition includes the genus Anomeri? It didn't say that? It said exactly that. The language says the term animal means any, any organism belonging to the kingdom Animalium. No limitation. But then the rest of the spec does nothing about talk except talk about farm animals and poultry and... Oh, no, I disagree, Judge Rader. I think if you look at the top... Show me something in the spec where it suggests that feeding humans is what you're trying to do. I will point you to the top column 7. And if you look in particular at lines 8 through 11, the purified omega-3 highly unsaturated fatty acids can then be used as a nutritional supplement for humans as a food additive or for pharmaceutical applications. You'll see later on in that same column, Judge Rader, a reference to the whole cell biomass. That starts in the paragraph that's at column 7, line 42. And that also talks about feeding humans as well. And ultimately, the specification supported our position on claim construction. The claim language supported it. There was a clear definition in this patent. And if the court doesn't honor that clear definition, then it's going to open every clearly defined term in a patent to relitigation because it will not be the end point. It will simply be the starting point. Can you tell me, I was a little slow in getting there, where exactly were you referring, Judge Rader? Column 7, I think you said. Yes, column 7. I believe it starts at line 5. But then if you go to line 42, that kind of kills you, doesn't it? Because it contrasts humans and animals. Well, I think what you see there is the reference to animal feed. Is that what you're referring to? Exactly. And I think... Human intake or animal feed. Human intake or animal feed. And what you're talking about there is a specific, the noun there is feed. And when we use the term animal feed, that connotes to, I think the ordinary reader as well as one of ordinary skill, that an animal that is receiving animal feed is what has been referred to in the record as a lower animal, not as a human. So it's actually completely consistent there. That discussion says human feed and non-human animal feed. It's inclusive of both. Well, the first three claims of that patent also are not restricted to... That's exactly right. And in fact, you'll see other claims that are restricted in that one. In fact, claim 2 says a non-producing animal. That's my great school understanding of the definition of a mammal. And I think that includes humans as well. That includes humans. So, I think when you read the 244 patent, it gives honor to the clear definition that was put in there without limitation. Well, I might add that if you look at... What do we give to the summary of the invention that talks about animals raised by the method of the present invention include poultry, cattle, swine, seafood, fish, shrimp, shellfish? I didn't see tennis playing humans there. Well, it could be incorporated into... Judge Reiter, that's because you can't produce milk. Well, I'm wondering your honors whether I should just play tennis and hit the ball back. But, in all seriousness Judge Reiter, if you look at the term raising an animal, you talk about raising a family. You talk about... I talk about raising my two-and-a-half-year-old daughter. In fact, we do that by buying milk that's fortified with DHA purchased by the state and purchased from my client. And that helps stimulate brain growth. I was walking the aisles of CVS yesterday and there are vitamins that recommend not only for adults like myself but for all ranges. The DHA is good for growth and good for brain growth, good for eyesight, good for joint health. This is exactly the sort of thing that is covered by these claims. Mr. Passani, back to 594. Sure. Why can't an abandoned application serve as corroboration of testimony of prior invention? This isn't obviously serving as constructive reduction of practice the patent didn't issue, but it's a document. It's an official document. It's got the name of the inventor. While we wouldn't be deciding facts, why was it excludable as evidence? Why couldn't it be corroboration of an inventor's testimony? It wouldn't corroborate Judge Lurie and the reason that it had to be excluded here was an actual reduction to practice. The question there is was this thing actually made and did it work for its intended purpose? As you said, it doesn't serve as a constructive reduction to practice. This Court's decision says that an abandoned application is worthless except for evidence of conception. But there was no interference. There were none of these exotic rules that we've created in terms of proving priority. It's just entirely or is it not a question of the fact that it has been written on the date to which it was entitled when it was filed? I still don't think that qualifies as an actual reduction to practice. Exactly. It's to show priority but not anticipation. But I don't think that's the let me think about that for a second. There would have been an opportunity for one or the other. But I don't think that would    opportunity for one or the other. I don't think that would have been an